FILED

03/16/2017

Clerk of the
Appellate Courts



# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 15, 2017

## STATE OF TENNESSEE v. TERRANCE LAVAR WALKER

**Appeal from the Circuit Court for Williamson County**
**No. I-CR017785     Joseph W. Woodruff, Judge**

## No. M2016-00687-CCA-R3-CD

Pursuant to a plea agreement, the Defendant, Terrance Lavar Walker, pleaded guilty to delivery of more than .5 grams of cocaine with an agreed upon Range I sentence of nine years, with the trial court to determine the manner of service of the nine-year sentence. After a sentencing hearing, the trial court denied the Defendant's request for an alternative sentence and ordered that the Defendant serve nine years in confinement. On appeal, the Defendant contends the trial court erred when it denied him an alternative sentence. We affirm the trial court's judgment.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Vanessa Pettigrew Bryan, District Public Defender; and J. Gregory Burlison, Assistant Public Defender, Franklin, Tennessee, for the appellant, Terrance Lavar Walker.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Kim R. Helper, District Attorney General; and Sean B. Duddy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A Williamson County Grand Jury indicted the Defendant for delivery of more than .5 grams of cocaine in a Drug-Free School Zone. On November 20, 2015, the Defendant pleaded guilty to delivery of cocaine with a recommended Range I sentence of nine years. The issue of alternative sentencing was reserved for the trial court's

determination. A copy of the guilty plea submission hearing is not part of the appellate record; however, the pre-sentence report summarizes the Defendant's offense:

On Thursday 5/9/13, 21st Judicial District Drug Task Force Agents P. Wheeler, J. Ashmore, and C. Wright used [a confidential informant ("CI")] to purchase one gram of cocaine from [the Defendant] for $80.00. . . . CI phoned [the Defendant] to further tentative arrangements that had been previously made to conduct a drug transaction. [The Defendant] instructed CI to meet him at a church near the Shell gas station on Fairground Street. . . . CI placed multiple calls and texts to [the Defendant]. The transaction was about to be canceled [sic], when [the Defendant] pulled into the parking lot.

At approximately 6:22 pm, [the Defendant] parked next to CI. CI waited for [the Defendant] to get off the phone and approached the passenger side of [the Defendant]'s vehicle. [The Defendant] stated, "Drop it on the seat" (referring to the money). "Hey keep the CD (inaudible) . . . Damn (Inaudible) . . . Man, that's why I can't be doin it like this at people man . . . Y'all do stupid shit like . . . I gave you the CD for a reason." CI took the drugs, said "Bye" and walked away from the vehicle. CI later explained that [the Defendant] handed CI a CD with the cocaine in the open hold of the CD. . . CI relinquished a small solid piece of cocaine to the agents and a post amble [sic] was conducted. CI noted that [the Defendant] had been wearing his work uniform from Drive Now.

The trial court held a sentencing hearing on March 24, 2016, to determine the manner of service of the Defendant's nine-year sentence. The trial court, at the State's request, entered the pre-sentence report as evidence. The defense then called its first witness, Shelika Poynter, the Defendant's girlfriend. Ms. Poynter testified that the Defendant lived with her and her two daughters, one of whom was also the Defendant's daughter. Ms. Poynter also had a third daughter who was an adult and no longer lived with them. She described the Defendant as being "great with the kids." Specifically, she said that the Defendant was a "big help" with their eleven-year-old daughter. Ms. Poynter explained that their child had "ADHD, she's borderline schizophrenic, she has ODD, she's on medication for anxiety, schizophrenic. So, one of us has to be with her at all times." She said that both she and the Defendant held two jobs, so they scheduled their work to allow one of them to be with their daughter.

Ms. Poynter testified that her mother had died in 2012, leaving her without other options for help with her children. She explained that if the Defendant was unable to help her, she would likely have to quit one of her two jobs. Ms. Poynter said that the

Defendant was like a mentor to her seventeen-year-old daughter, encouraging her to make good decisions. She reiterated that the Defendant held two jobs and was attending "church now." She said that the Defendant also helped care for her oldest daughter's son.

Ms. Poynter testified that she had observed positive change in the Defendant. She attributed this change to personal growth and the fact that he had a family who cared about him now. Ms. Poynter reiterated that the Defendant's absence from their home would create a significant hardship concerning childcare and finances.

On cross-examination, Ms. Poynter testified that her aunt and three cousins lived near her. She agreed that her aunt often helped supervise her youngest daughter when she and the Defendant were both at work. Ms. Poynter agreed that the Defendant had "numerous felony" drug convictions from 2000 through 2007 and that he had been terminated from Drug Court for selling drugs. Ms. Poynter said that the Defendant was not currently attending any type of drug rehabilitation treatment but that he had contacted Educare about a drug assessment class but was unable to afford the enrollment fee.

The Defendant testified that he had "a rough life growing up without [his] parents" but that he had found support through Ms. Poynter and her family. He said that he was trying to "do better" for his children. He described his childhood saying that he did not meet his mother, who was incarcerated, until he was five or six years old when she retrieved him from his home in Jackson, Tennessee and moved him to Franklin, Tennessee. From then on he was "back and forth" between Jackson and Franklin until he was ten or eleven. He said that, at the time, he believed his "so called friends" were really his family. It was during this time that he was exposed to selling drugs and "bad habits."

The Defendant testified that he was proud of the improvements he had made. He stated that the current charge "really got to [his] attention" and caused him to make different choices. He realized he was "hanging around the wrong guys," believing that they "cared" about him but later realizing that these people were using him to deliver drugs. He described his history with criminal charges and described himself as being changed. The Defendant's four children, other than his daughter with Ms. Poynter, lived outside his home. He expressed a desire to seek visitation with his children with whom he did not have regular contact. He described himself as being very involved with his and Ms. Poynter's daughter as well as Ms. Poynter's two older daughters. The Defendant described these three girls and Ms. Poynter as being "a big help" to him and what he "live[d] for everyday." He described his role in caring for his and Ms. Poynter's daughter, saying that he made sure she got to school and took her daily medication. He admitted feeling overwhelmed by her disabilities at times but assured the court that he was attending classes and learning how to best care for this daughter.

The Defendant identified letters to the court from Ms. Poynter's two daughters, which described the Defendant's role in their lives. The trial court entered both letters as exhibits to the hearing. The Defendant agreed that he had become actively involved with a church. He testified that he worked at the emissions testing station in Cool Springs and a Kentucky Fried Chicken restaurant. He confirmed that he was an employee in good standing at both places of employment. The Defendant identified two letters from his employers about his work performance. Both letters indicated that the Defendant was a reliable employee and was being considered for promotions.

The Defendant testified that he worked 30-35 hours a week at Kentucky Fried Chicken, going to the restaurant as soon as he was done working at the emissions testing station. Because of this schedule, he had been unable to attend any AA meetings. He explained that his current work schedule left him "barely [any] time for anything" else but that he wanted to seek "help" for his addiction. The Defendant agreed that sobriety had to be his priority. He confirmed that both places of employment had agreed to work with him on any conditions of probation that the trial court might require.

On cross-examination, the Defendant agreed that he did not provide child support for two of his five children. He agreed that he had a number of convictions and probation violations and was on parole at the time of the current offense.

After hearing this evidence, the trial court denied an alternative sentencing based on the following:

> On November 20, 2015, the [D]efendant plead guilty to the amended charge of Delivery of Cocaine, a Class B Felony. Pursuant to a negotiated agreement with the State, the [D]efendant was sentenced as a Range 1 Standard Offender to nine years and to pay a fine of $5,000 to the 21st Judicial District Drug Task Force.
>
> This case comes before the court today for the [d]ermination of manner [of] service and all remaining sentencing issues. The [D]efendant seeks a fully suspended and probated sentence. The State argues that the only appropriate sentence is one to serve in the Department of Corrections [sic].
>
> In granting or denying probation, courts are to be guided by certain considerations including but not limited to the following: Number one, the Pre-sentence Report, which I have received into evidence as Exhibit 1.

4

Two, the [D]efendant[']s physical medical condition and social history. The Pre-sentence Report describes the [D]efendant[']s physical condition as fair. The [D]efendant testified and the court therefore finds that he had to leave a particular employment due to occurring back pain, otherwise the defendant has no chronic, physical, or medical limitations. His mental condition, according to the Pre-sentence Report, is excellent. And it is the case that there is no evidence before the court that the [D]efendant has any diagnosed mental or emotional illness or defect.

On the other hand, the court finds from the evidence, that the [D]efendant is addicted to illegal drugs, principally cocaine. This finding is supported in part by the [D]efendant's own version of the offense where in he states that "I wanted to get high so I did anything I could do to get high" as well as the testimony of Ms. Shelika Poynter to the effect that for a significant period of time the [D]efendant used drugs daily.

The [D]efendant's social history is remarkable in several aspects, first his childhood can only be describes as chaotic. His mother was in prison for the first five years of his life. As a child and adolescent, he was shuttled between relatives in Jackson, Tennessee and Franklin.

He graduated from Franklin High School where he was a gifted two sport athlete. But failed to achieve his potential due to drug use, which led to poor academic performance, which disqualified him from playing sports. From the time he graduated high school until after he was arrested for the present offense, the [D]efendant devoted his energies to using and distributing drugs and fathering five children ranging in the ages from seven to eighteen with five different women. Three of the [D]efendant's children were born at times when [the D]efendant was in prison.

The facts and circumstances of the offense, as described in the Pre-sentence Report, the [D]efendant sold approximately 1 gram of cocaine to a confidential informant in the parking lot of the Kroger Shopping Center located on Del Rio Pike in Franklin, Tennessee in a location within 1,000 feet of a public school.

The manner of the sale and the recorded conversation between the [D]efendant and the confidential informant reflects a degree of familiarity with the commerce and illegal drugs on the defendant's part.

5

The prior criminal history of the [D]efendant is extensive and is detailed in the Pre-sentence Report. Most significantly for purposes of the decision whether to grant probation on the numerous times the [D]efendant has been afforded alternative sentencing including Drug Court, and the fact that he has been convicted of several offenses including the present offense while he was on release status from a previous conviction.

Previous actions and character of the [D]efendant, apart from the [D]efendant's actions over the last eight months, the [D]efendant's demonstrated character would be one of an [sic] habitual drug offender whose crimes increased in severity over time. In the last eight months, however, the [D]efendant has been employed full time and since January of this year he has been holding down two jobs.

The [D]efendant is currently active in his church and volunteers as a coach for a youth basketball team. These commendable actions on the [D]efendant's part are directly attributable to Ms. Poynter, with whom the [D]efendant lives along with their special needs daughter, who insisted the [D]efendant reform his conduct or face being put out on the street. The court finds Ms. Poynter to be a credible witness. She honestly believes the [D]efendant had made a genuine change towards rehabilitation.

Whether or not the [D]efendant might reasonably be expected to be rehabilitated and the [D]efendant's potential or lack thereof for rehabilitation, the court would like to be able to share Ms. Poynter's confidence in the [D]efendant's rehabilitation potential. The objective evidence shows the opposite.

Since high school, the [D]efendant has been in the criminal justice system and he had been afforded every alternative to incarceration available. He has received probation, split-sentencing, restorative sentencing through Drug Court. He has been paroled from prison that the threat of significant incarceration hanging over his head to deter further criminal behavior. None of these alternatives have worked. There are no resources that have . . . been spared in efforts to rehabilitate [the Defendant]. Only [the Defendant] can decide whether he will achieve rehabilitation.

The court accepts at face value [the Defendant]'s testimony regarding his religious conversion. The fact that he has not at the same time participated in the help available through the numerous 12-Step

6

Programs in our community is extremely troubling and weighs against the conclusion that one more round of probation is all the [D]efendant needs to not offend again.

Less restrictive measures and confinement have frequently and repeatedly been applied to the [D]efendant without success. Indeed, the offense for which [the Defendant] had been sentenced today was committed while he was on parole.

Considerations of general deterrence also weigh in favor of imposing a sentence to serve[.] [T]his is particularly so given the [D]efendant's extensive criminal history. A sentence of confinement would also achieve specific deterrence for [the Defendant] during the time of his incarceration.

The court is very mindful, however, of the collateral consequences of imposing a sentence of confinement upon [the Defendant]. A sentence of incarceration will harm innocent people such as [ ], his special needs daughter and her mother Shelika Poynter, who will have one less person available to share the burden of caring for [the daughter]. Likewise, his children for whom he is paying child support will be injured by the absence of financial assistance of the custodial parent to provide for their needs. The general public will also be injured by the loss of a productive workforce of a man in his prime who instead of contributing to society through honest labor will be warehoused in prison.

[The Defendant]'s counsel urges the Court to grant [the Defendant] one final opportunity. He argues that on [the [D]efendant]'s behalf, that he will gladly comply with every condition of probation the Court chooses to impose. Hold this nine year sentence over [the Defendant]'s head, his counsel says, and make him know that if he backslides again, the consequences will come down upon him. [The Defendant] has been ably represented in this case. Only the most zealous and effective advocacy could have convinced the State to offer [the Defendant] the concessions on sentencing reflected in the Negotiated Plea Agreement with respect to range and length of sentence. The Defense counsel would have the Court postpone, yet again, the day of reckoning for [the Defendant] on the hope that this time [the Defendant] has found within himself the means to rehabilitation.

Based upon all of the facts and the consideration the Court is required to address, I conclude that alternative sentencing in this case is not

appropriate. Accordingly, the Court orders [the Defendant]'s sentence of nine years to be served in the Department of Corrections [sic].

It is from this judgment that the Defendant appeals.

## II. Analysis

The Defendant asserts that the trial court abused its discretion when it denied the Defendant's request for an alternative sentence. The State responds that the trial court did not abuse its discretion in denying the Defendant an alternative sentence. We agree with the State.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a)(2014). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-3-303(b); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In

8

determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

After review, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. *See* T.C.A. § 40-35-210, Sentencing Comm'n Cmts.; *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

To the extent the Defendant argues that the trial court did not give proper weight to enhancement and mitigating factors, the trial court's determinations as to the weight given to the mitigating and enhancement factors is at the trial court's discretion and not a basis for reversal by this Court. *See State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The Defendant also argues that the trial court failed to consider that the Defendant's criminal conduct did not cause or threaten serious bodily injury as a mitigating factor. *See* T.C.A. § 40-35-113(1). It is clear from the record that the trial court specifically considered the offenses and circumstances of the offense. Although the trial court did not explicitly address this mitigating factor, it appears that the trial court considered the mitigating factor, but chose to give it little, if any, weight. Again, the weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our Code, and as long as its findings are supported by the record. *See Carter*, 254 S.W.3d at 345.

9

The Defendant also argues that the trial court, in denying an alternative sentence, provided a "conclusory statement" regarding deterrence without any evidence to support the assertion. The State argues that the Defendant incorrectly relies on *Bingham*, when the applicable law is *State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000) (holding, "to the extent that *Bingham*, *Bonestel*, or any other case can be read to require proof that incarceration *will* or *should* result in deterrence, it is hereby overruled."). The court in *Hooper* provided a standard and five non-exclusive factors for consideration in determining whether deterrence was a proper basis for denying alternative sentencing. *Id.* at 10-12. *Hooper*, however, addressed instances where deterrence is the sole basis for imposing a sentence of confinement. That is not the issue in this case, thus we need not review this case under *Hooper*. As a basis for denial, the trial court also found, "Less restrictive measures and confinement have frequently and repeatedly been applied to the [D]efendant without success. Indeed, the offense for which [the Defendant] had been sentenced today was committed while he was on parole." The record supports the trial court's denial on this basis.

The trial court carefully followed the statutory sentencing procedure. It thoroughly considered the facts and circumstances of the offense. It is clear from the record that the trial court's decision to deny an alternative sentence was the result of a proper application of the appropriate sentencing principles to the facts and circumstances of the Defendant's crime. Accordingly, the Defendant has failed to establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded to the trial court's decision to order the Defendant to serve his sentence. The Defendant is not entitled to relief.

### III. Conclusion

After a review of the record and applicable law, we conclude that the trial court properly sentenced the Defendant. In accordance with the foregoing reasoning and authorities, the judgments of the trial court are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE

10